2025 IL App (1st) 210723-U

FIFTH DIVISION
March 7, 2025

No. 1-21-0723

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 20877 |
| | ) | |
| IAN ARMSTRONG, | ) | Honorable |
| | ) | William H. Hooks, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Oden Johnson and Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions for first degree murder and home invasion are affirmed where (1) comments made on the record by the trial judge do not indicate that defendant was denied a fair trial, (2) there was sufficient evidence to conclude that defendant was the shooter and therefore subject to mandatory firearm sentencing enhancements, (3) it was not an abuse of discretion for the court to deny defendant's request to revoke his waiver of counsel midway through sentencing, (4) the court did not consider improper sentencing factors, and (5) the sentences imposed, which were within the statutory ranges for the charged offenses, are not excessive.

¶ 2    Following a bench trial, defendant Ian Armstrong was convicted of first degree murder and home invasion. The trial court sentenced him to an aggregate term of 125 years in prison. Mr.

Armstrong raised a number of purported errors on direct appeal, including, initially, that the court erred by failing to conduct a hearing, pursuant to *People v. Krankel*, 12 Ill. 2d 181 (1984), to ascertain the merits of his *pro se* claims of ineffective assistance of counsel and that the State was improperly allowed to participate in the court's preliminary inquiry into those allegations. The State agreed that its involvement had been more than a *de minimus* and that a new inquiry before a different judge was therefore necessary. We remanded for that limited purpose, and the trial court again concluded that Mr. Armstrong's claims of ineffective assistance did not warrant further proceedings.

¶ 3      Mr. Armstrong now asks us to consider the remaining issues raised in this appeal, that (1) he was denied a fair trial because the trial court relied on personal opinions and facts outside the record; (2) the State failed to prove beyond a reasonable doubt the predicate for a sentencing enhancement, *i.e.*, that he personally discharged the firearm that caused the victim's death; (3) he should have been allowed to revoke his waiver of counsel at sentencing; (4) the court considered improper sentencing factors; and (5) the sentences imposed were excessive. For the reasons stated below, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5      Mr. Armstrong was charged with first degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 2012)) and home invasion (720 ILCS 5/19-6(a)(3)-(5) (West 2012)), in connection with the shooting of Gregory Dixon on May 25, 2013. In support of a mandatory 25-year sentencing enhancement separately applicable to each of those charges (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2020); 720 ILCS 5/19-6(c) (West 2020)), the State alleged that at the time he committed these offenses, Mr. Armstrong personally discharged the firearm that proximately caused great bodily harm or death to Mr. Dixon.

¶ 6                                    A. The Evidence at Trial

¶ 7      Mr. Armstrong was represented by private counsel at trial. He waived his right to a jury, and a bench trial was held in spring 2019. The State's theory of the case was that Mr. Armstrong and another man, both wearing masks and dark clothing, gained entry to the apartment where Mr. Dixon was living, burst into the bedroom where he and his girlfriend were sleeping, and shot him nine times, killing him. The police found a trail of blood leading from the bedroom down the hallway of the apartment, and DNA testing matched that blood to Mr. Armstrong.

¶ 8      Defense counsel argued that the shooting took place at a drug house where a number of people regularly came and went, that Mr. Dixon supplied drugs to the owner and occupants of the house, and that the two individuals in question were buzzed in by the owner of the apartment. Counsel insisted that the State could not meet its burden of proof merely by showing that Mr. Armstrong's blood was in the apartment when it was unknown how that blood came to be there.

¶ 9      We have reviewed the evidence and events in the trial court with a focus on those facts that are most relevant to the five issues raised in this appeal.

¶ 10     The State first called Tonette Mills, Mr. Dixon's girlfriend. She testified that they had been together for six or seven years and that he was the father of one of her two children. In the early morning hours of May 25, 2013, she and Mr. Dixon were asleep in the bedroom of an apartment at 1440 East 52nd Street in Chicago, owned by a man known to her only as Anthony, and they had been staying there for five or six months. There was only one bedroom, but people sometimes paid to sleep on pallets in the living room. Ms. Mills acknowledged that drugs were used in the kitchen and living room areas of the apartment but explained that she did not do drugs and tried to avoid those areas. She did not know Mr. Armstrong and had never seen him before.

¶ 11     Ms. Mills testified that she and Mr. Dixon arrived at the apartment around 9 p.m. There

was no blood on the ground, on the walls, in the living room, or in the hallway leading to the bedroom at that time. They ate pizza and watched a movie in the bedroom, then went to sleep. At around 1:48 a.m., the bedroom door was kicked in, and Ms. Mills could see by the hall light two men dressed in black pants, black hoodies, black hats, and with black-and-white bandanas covering their faces. Mr. Dixon "jump[ed] right in front of the door," and one of the men "walk[ed] in shooting him" and "just kept shooting him." Mr. Dixon fell facedown to the floor, half in and half out of the bedroom, and the men left. Ms. Mills did not see where they went. She used Anthony's phone to dial 911.

¶ 12    Ms. Mills described the shooter as "kind of heavyset" and the gun as "old-fashioned." She was shown still photographs from surveillance footage showing two individuals entering the building just after 1:48 a.m. and leaving again, from the stairwell that led to the apartment, approximately two minutes later. She did not recognize the men but agreed that how they appeared in the photographs was "consistent with what [she] saw inside the apartment."

¶ 13    Ms. Mills acknowledged on cross-examination that Mr. Dixon supplied Anthony and other people who came by the apartment with crack cocaine and that, in exchange, she and Mr. Dixon were allowed use of the apartment's sole bedroom. When asked who was present when she and Mr. Dixon arrived, Ms. Mills said, "Everybody." There were some guys standing around in front of the building, and inside the apartment were individuals Ms. Mills knew as Georgia, Whoopie, and Jeff. A man Ms. Mills did not know was also there to give Mr. Dixon a haircut. Ms. Mills could not say whether anyone else arrived while she and Mr. Dixon were in the bedroom, because by the time she emerged, everyone had run out the back door of the apartment. Ms. Mills testified that when she and Mr. Dixon went to bed it was quiet, and she was awakened when the two masked men burst into the bedroom. She also did not know how blood got in the hallway of the apartment.

She agreed it could have been deposited there any time after 9 p.m. and possibly before Mr. Dixon was shot.

¶ 14    Alexandria "Whoopie" Banks testified that she was staying in the living room of the apartment on the night when the shooting occurred. She was in the kitchen at the rear of the apartment having a conversation with "another gentleman and Georgia." The buzzer for the door sounded and, shortly thereafter, a Black man wearing dark clothing, a skull cap, and "a handkerchief over his face, up to his eyes" came into the kitchen. According to Ms. Banks, the man was "a bigger guy" who was "[f]airly light skinned" and had an "old styled" gun, a revolver with a "very long barrel," in his right hand. He "put his left finger up to his mouth," and waved for them to move into the front room. Without waiting for them to do so, however, the man "pivoted and went to [Mr. Dixon's] bedroom." A second man, also armed with a pistol or revolver, stayed in the living area that was in the front of the apartment. According to Ms. Banks, he was "a thin guy with darker skin." When asked who was taller, Ms. Banks said, "I would say the one that was in the back." Ms. Banks heard the first man kick in the bedroom door and heard Mr. Dixon say, "[W]hat the?" in what she described as "a state of shock." Shots were fired, and Ms. Banks and the others ran out the back door of the apartment.

¶ 15    Chicago police detective Robert Graves testified that he and two evidence technicians arrived at the scene around 2:45 a.m. Detective Graves observed drops of fresh blood "immediately in the doorway" on the hardwood floor, behind the front door, and along the hallway, as well as on the wall immediately across from the bedroom. Mr. Dixon was lying face down in the doorway between the bedroom and hallway, with gunshot wounds to his back and head.

¶ 16    Detective Graves explained on cross-examination that the blood he still had "some moisture in the thicker areas" when he conducted his walkthrough, more than one hour after the

shooting. He acknowledged, however, that he did not describe the blood as fresh or moist in his crime scene report and that the blood did not appear moist in any of the crime scene photos but explained that those photos were taken some time after he made his initial walk-through.

¶ 17 Sergeant Sean Ryan testified that he recovered video footage of the exterior of the building and the interior lobby, which was played at Mr. Armstrong's trial. Sergeant Ryan observed that the footage showed two Black men dressed in dark clothing approach the front of the building at 1:48 a.m. while pulling bandanas over their faces. One, according to Sergeant Ryan, was "a shorter, stockier individual" and the other "a taller, slender individual." The men entered the building and disappeared into the stairwell leading to the apartment where the shooting took place. Just before 1:51 a.m., those same two individuals passed through the lobby and exited the building. Sergeant Ryan observed that the shorter, stockier man could be seen walking in front, with his left hand in his pocket, and that he opened the door with his right hand. Time-stamped still photos taken from the surveillance footage were also introduced at trial. We have reviewed those photos and find them to be consistent with Sergeant Ryan's descriptions of the men in the video footage. The footage itself does not appear in the record on appeal.

¶ 18 Sergeant Ryan agreed on cross-examination both that the individual seen exiting the building first had no visible injury or blood on his clothing and that he appeared to walk with the same gait and at the same speed as when he had entered the building.

¶ 19 Nurse Monika Dlugopolski testified that she was working the night shift at Christ Hospital when, at approximately 3 a.m. on May 25, 2013, Mr. Armstrong presented with a gunshot wound to his left hand. She described it as an actively bleeding wound with "some black smearing." As required with all gunshot wounds, she called the Oak Lawn police, and they sent an officer over to question Mr. Armstrong.

¶ 20    On cross-examination, Ms. Dlugopolski agreed that Mr. Armstrong was dressed normally. From what she could recall, he was not wearing all black, nor was he wearing a mask or a hat. The whole time she observed him, Mr. Armstrong held his injured hand against his chest. She agreed that placing it in his pocket would have made it bleed more and would have caused him more pain.

¶ 21    Officer Hollingsworth (no first name given) testified that at approximately 5 a.m. on May 25, 2013, he was dispatched to Christ Hospital in Oak Lawn. Mr. Armstrong told the officer that he had been drunk and high for most of the day and "had been just standing around" when "all of a sudden, a boom, he had been shot." He could not tell the officer how he got to the hospital or who he had been with that night and refused to answer further questions without a lawyer present.

¶ 22    The parties stipulated that, if called to testify, the medical examiner in this case would conclude that Mr. Dixon died of multiple gunshot wounds. Mr. Dixon had a total of nine gunshot wounds. Two medium-caliber bullets were recovered from his body, one from his abdominal wall and one from his left upper chest, and an expert in the field of ballistics would testify that those were 38/367 caliber fired bullets that may or may not have been fired from the same gun. That same expert would testify that five fired cartridge cases collected from the scene were of a different caliber. They were CCI 22 long rifle Stinger caliber fired cartridge cases, and the expert concluded that they had all been fired from the same firearm. Experts in the field of forensic DNA analysis would testify that the blood sampled from the entryway, hallway floor, and hallway wall of the apartment was tested and found to match Mr. Armstrong's DNA profile.

¶ 23    The State rested, the trial court denied Mr. Armstrong's motion for a directed finding, the defense rested without presenting any evidence, and counsel made their closing arguments.

¶ 24    Following a one-month recess, the trial court announced its findings on April 24, 2019. The judge noted in his introductory remarks that he had "applied his life experience, professional

and legal training, and judicial experience" as well as his "common sense." He began by acknowledging that Mr. Dixon was more than a case number; he "was somebody's Son, somebody's Father, and somebody's Boyfriend." He then recited at length details concerning the nine gunshot wounds Mr. Dixon suffered, commenting on that evidence as follows, based on his experience reviewing autopsy reports in the Marine Corps:

> "The Medical Examiner's report also provides information that is consistent with the caliber of bullet, which I believe was a .22 caliber long rifle bullet; and rifle is just a term determining the bullet. It doesn't mean it had to come from a rifle. That is such a velocity that it actually sometimes trails and follows different parts of the body structure, from point of entry, to either point of exit, or sometimes remains in the body.
>
> When the firing of the .22 caliber weapon is so close, this bullet typically just rips up things and many times stay in. The bullets sometimes exit.
>
> The medical reports in this case, document this more thoroughly; but regardless as to whether the bullets that were—the 9 rounds that entered the body, exited or not, the damage caused by those rounds, reflect very close firing in most cases.
>
> I like to refer to it as very up close and personal firing; and it took the life of this young man, at the time that those rounds were sustained by that body."

The judge noted that Mr. Dixon "manned up, got up, and tried to find out what he could do," but "[b]efore he could do anything, the person with the firearm, started using that firearm in a very violent and terminal manner."

¶ 25   The judge acknowledged that Mr. Armstrong could not be identified, either by the eyewitnesses or from the surveillance footage, as one of the two men who entered the apartment or as the shooter. The judge was persuaded, however, that the presence of his blood at the scene,

8

together with the eyewitness testimony, proved that he was the shooter:

"At some point, the shooter, maybe because of the adrenaline, maybe because he wasn't the professional killer that he thought he was, maybe because of a higher being or higher power, somehow, the shooter injured himself.

It is ironic if somebody injuries [*sic*] themselves, with the instrument that they were trying to use to injure—not to injure, to kill another.

Somebody else in addition to Mr. Dixon, suffered injury on the morning in question.

Sort of like footprints in the snow, except that they're not footprints. There's blood.

One would think that the victim would be the major source of blood in such a shooting.

See, if you had a larger weapon, like a .45, or a .357, or something of that nature, but even a .9, the blood would be all over the place from the victim, because of the impact of the cartridge on the human body, and the resulting squirts, and the resulting flood of blood from that victim.

If you stab somebody, the blood would be squirting; but see, the .22 caliber bullet is a funny bullet. It's a bullet that has enough power to kill, to rip, to deform, to torture; but it doesn't always blast the amount of blood that some of these other weapons of death blast.

But apparently, the .22 caliber long cartridge may have had another victim. It may have been the shooter himself, because near different portions of the wall, the body, the floor, there's a spread of blood that was later collected by law enforcement."

¶ 26    As to the fact that Mr. Armstrong arrived at the hospital without blood on his clothing, the court said:

"A bleeding hand is a messy situation. Your hand will bleed, and just keep bleeding; and it's hard to stop it, because of the many nerve endings, you know, the feeding of the artery from the arm down to the hand; and the hand is always used; and the hand just bleeds; but there wasn't a lot of evidence of—I didn't hear any testimony about the blood being all over his pants, and his shirt, and all that.

\* \* \*

In fact, a skeptic may surmise that maybe, that hand caused so much blood, that he may have had to stop to change clothing, so that he wouldn't come into the emergency room, too messy."

¶ 27    The court concluded from the testimony of Ms. Banks and Detective Graves that the blood found in the hallway and entryway of the apartment unit—which DNA testing confirmed was Mr. Amstrong's—was not there before the shooting. "The observations speak for themselves," the judge said. The fact that Mr. Armstrong's DNA matched the blood found in the apartment put him "right in the middle of this situation." "It just locks him down," the judge remarked. "He's the stouter of the two. The shorter of the two." The judge continued, "He's the one that was armed with the .22 caliber weapon of some sort. He's the one that fired the bullets after kicking in the front door of the house, then barging into the subject bedroom, to shoot a man who is laying in the bed with his girlfriend." The court concluded that Mr. Armstrong "masked up, clothed up, entered the building, somehow shot himself in the hand, bled near the body, the exit of the room" and "in the haste of what he had done, caused blood to be near the body, \*\*\* on the floor," and "at the door." The surveillance footage showed the "shorter" and "broader" of the two individuals with his left hand in his pocket as he left the building and that was the hand where Mr. Armstrong had suffered a gunshot wound.

¶ 28    The court found Mr. Armstrong guilty of numerous counts of first degree murder and home invasion, including counts for which the State had alleged that he personally discharged the firearm that proximately caused Mr. Dixon's death.

¶ 29                                B. Post-Trial Proceedings

¶ 30    Mr. Armstrong's attorney filed a motion for a new trial on May 28, 2019, and was granted leave to withdraw that same day, when Mr. Armstrong informed the court that he wished to raise a *pro se* claim of ineffective assistance of trial counsel. The public defender was briefly appointed to consult with Mr. Armstrong on that matter, but Mr. Armstrong informed the court at the next status that he still wanted to represent himself. The court warned him that the decision to represent himself, where he "could be locked up for life," was "probably not a good decision at all, regardless of the underlying facts of the murder case." The court then asked the assistant public defender to speak with Mr. Armstrong once more, and to take a supervisor with him, because "once this is done, it's done and I'm going to go through all the things with him, so that everybody knows that."

¶ 31    Mr. Armstrong persisted in his request to represent himself, after receiving extensive additional admonishments from the court regarding the expertise of the public defender's murder task force, the complicated and important steps that would need to be taken on his behalf post-trial (including the filing of a post-trial motion and the putting together of a sentencing package), and the lengthy sentences he faced. On September 13, 2019, the court finally granted Mr. Armstrong's motion to proceed *pro se*.

¶ 32    At status hearings held over the ensuing months, Mr. Armstrong was given access to his attorney's file and the trial transcripts. His requests for police reports and other discovery materials, to the extent they were not contained in his attorney's file, were repeatedly denied because, as the court explained, the trial was over; Mr. Armstrong could raise errors that had

occurred at trial, but he could not retry the case. The court made clear to him on numerous occasions that the case had "gone too long." It would hear his motion for a new trial as soon as it was filed and, if that motion was denied, would proceed directly to sentencing.

¶ 33 No hearings were apparently conducted in this matter from about March 2020 (the onset of the COVID-19 pandemic) until July 2020, when they were resumed via video conference. The court had decided, by that point, to provide Mr. Armstrong with the discovery materials he had been requesting. Mr. Armstrong informed the court that he was having difficulties conducting the legal research necessary for his post-trial motion and a motion he intended to file, pursuant to *Krankel*, 12 Ill. 2d 181, asserting claims of ineffective assistance of trial counsel, but the court declined to intervene, not wanting to "micromanage" how the sheriff was running the Cook County jail during a pandemic. When, in September, Mr. Armstrong still had not filed his amended motion for a new trial, the court gave him a 30-day deadline in which to do so. When that date came, Mr. Armstrong still was not ready. The court gave him one additional week to either file his motion or to make an oral motion but said that, either way, it would hear argument on the motion at the next court date because "[t]he delay ha[d] been tremendous in this matter."

¶ 34 At the next hearing, Mr. Armstrong's motion for a continuance was denied, and he was again admonished to file his motion for a new trial. "[T]he next time this matter is up," the court warned him, "it's up for argument." Mr. Armstrong told the court, "If I plan to put any motion in, it's going to be a *Krankel*," to which the court responded that he could argue a *Krankel* motion at the same time if he wanted, but there would be no further continuances. Mr. Armstrong had filed nothing by the next hearing and was not prepared to orally make either motion. The court gave him one additional week but made clear that it would then move on to sentencing. Mr. Armstrong appeared on December 2, 2020, with a motion for a *Krankel* hearing but no motion for a new trial.

12

The court ordered a short continuance so Mr. Armstrong could file his *Krankel* motion, and the State could review it and respond.

¶ 35    A preliminary *Krankel* hearing was held on December 10, 2020. Mr. Armstrong argued that his trial counsel was ineffective for failing to call a witness, failing to object to expert testimony, and failing to present a competing expert. The court questioned Mr. Armstrong at length, concluding that his claims did not warrant the appointment of counsel or further proceedings. Because Mr. Armstrong's proffer was deficient, the court noted that there was no need for the State to respond.

¶ 36    The court gave Mr. Armstrong until January 7, 2021, to file his motion for a new trial, but made clear to him that the motion would be argued on January 13, 2021, and if it was not granted "you will be going to sentencing on that date." Mr. Armstrong said he understood.

¶ 37    On January 13, 2021, the trial court informed Mr. Armstrong, *sua sponte*, that it would be "willing to hear some more proffer" on his *Krankel* motion. The preliminary *Krankel* inquiry was reopened and continued to February 10, 2021. Mr. Armstrong again presented his points and was questioned at length by the court. At the court's prompting, the State then responded at length, over the course of approximately nine transcript pages, in support of the denial of Mr. Armstrong's request for a *Krankel* hearing. The court again denied the motion. It was the State's participation in that hearing that led to this court's earlier decision remanding this case for a new preliminary *Krankel* inquiry.

¶ 38    On February 10, 2021, Mr. Armstrong told the court that he had a motion for a new trial ready but wished to argue it at a later date. The court set the motion for argument on March 24, 2021, and again reminded Mr. Armstrong that if it was denied, they would move forward with sentencing on that date. Mr. Armstrong again said that he understood. The assistant state's attorney

indicated that she would be ready for sentencing and only intended to call one witness.

¶ 39    Court next convened in person, with social-distancing measures taken due to the COVID-19 pandemic, on March 24, 2021. Mr. Armstrong argued his motion for a new trial, and the State responded. The court denied the motion. It reiterated its view that "[t]his was not a close case." Mr. Armstrong's blood was found at the scene, and the notion that it was there because of some earlier fist fight in the apartment was, in the court's words, a "a ridiculous proposition."

¶ 40    The parties then proceeded to sentencing. They agreed that the updated presentence investigation (PSI) report was accurate. The court asked Mr. Armstrong if he had "any mitigation of any sort," and he said, "Not present at the time." The court reminded Mr. Armstrong that he had repeatedly been told sentencing would immediately follow the ruling on his post-trial motion and again asked him if he wished to raise any mitigating facts. Mr. Armstrong said, "No, Your Honor, just that I don't have any felonies in my background."

¶ 41    The State then made its arguments in aggravation. The State's position was that the minimum sentence Mr. Armstrong could receive was 76 years in prison (a term of 45 years for murder, which included a mandatory 25-year firearm enhancement, and a consecutive term of 31 years for home invasion, which also included a mandatory 25-year firearm enhancement). Emphasizing the ruthless and premeditated nature of the murder and that the victim was a father, the State asked the court for a sentence of natural life on the charge of murder and 55 years on the charge of home invasion.

¶ 42    Mr. Armstrong again indicated that he was not prepared to make sentencing arguments. The court agreed to hold the matter over for six days, to allow him to present any witnesses in mitigation that he might have. The court made clear that it would render a sentence that same day, "after everybody rests," and that it was "not taking another day beyond that" because the parties

14

had "been waiting for a decision on this matter for quite a while."

¶ 43    At the continued hearing on March 30, 2021, Mr. Armstrong had no witnesses to present. The court began by saying, "You are going forward *pro se*, correct?" to which Mr. Armstrong asked, "Is it too late to get an attorney?" "You are your own attorney. Yes, it's too late," the court answered. The court asked Mr. Armstrong if he had anything else to present before it "consider[ed] certain legal issues with respect to sentencing," and Mr. Armstrong said "No." The court noted that the case had been held over so that Mr. Armstrong "could review what [he] heard from the State and then make any comments [he chose] to make." The court then asked Mr. Armstrong if he had any such comments to make, and Mr. Armstrong said, "Not at all, your Honor."

¶ 44    The court noted that "[t]here was nothing in the pre-sentence investigation that [it was] considering adverse to [Mr. Armstrong]." It gave no weight, for example, to Mr. Armstrong's past misdemeanor convictions or juvenile record, and it noted that he had no felony record of any kind, a mitigating factor in his favor. The court observed that Mr. Armstrong, who was 27 years old at the time of the shooting, was "not middle aged but he's not a youngster." According to the PSI report, he had a loving and supportive home environment with no DCFS involvement and no allegations of abuse. He was suspended from high school for fighting but "made up for it by getting his GED," attended community college for some time, was self-employed doing maintenance work, and had no history of gang involvement. The court reiterated that the contents of the PSI report were "not aggravation at all."

¶ 45    In aggravation, the court noted "the cold-blooded and deliberate nature of the murder." The judge found it "particularly vicious" that the victim was sleeping in bed with a loved one when he was gunned down and commented on Mr. Armstrong's "conscious efforts to hide this crime" and "to make good his escape" by seeking treatment at a hospital some distance away and lying about

15

the cause of his injury.

¶ 46 The judge acknowledged that fashioning a sentence for murder is "a heavy responsibility" and one he took seriously. "With no criminal background whatsoever," he had decided that a sentence of natural life in prison was not appropriate. That was a sentence he reserved for those who "had a lifetime of crime before they murdered more than one person." Because this was a deliberate crime and not "a heat-of-the-moment situation," the court also considered whether the sentence imposed might deter others in the future.

¶ 47 The court merged the counts into a single count of first degree murder (720 ILCS 5/9-1(a)(2) (West 2012)), and a single count of home invasion (720 ILCS 5/19-6(a)(5) (West 2012)). Concluding that there was no one-act, one-crime problem and that consecutive sentences and separate firearm enhancements were required by statute, the court sentenced Mr. Armstrong to consecutive terms of 75 years (50 years plus the 25-year firearm enhancement, to be served at 100%) on the charge of murder and 50 years (25 years plus the 25-year enhancement, to be served at 85%) on the charge of home invasion, for a total of 125 years in prison.

¶ 48 The court denied Mr. Armstrong's motion for reconsideration. It noted that Mr. Armstrong had neither accepted responsibility for his crimes nor expressed remorse to the victim's family and that, by statute, it had no discretion to make the sentences concurrent rather than consecutive. The court stood by the sentences it had imposed.

¶ 49 C. Proceedings on Limited Remand

¶ 50 Mr. Armstrong appealed, arguing, among other things, that the State was improperly allowed to participate in the court's preliminary *Krankel* inquiry. The State agreed that it had had more than a *de minimus* involvement in that proceeding and that a new *Krankel* inquiry before a different judge was therefore necessary. See *People v. Jolly*, 2014 IL 117142, ¶ 38 (explaining that

a preliminary *Krankel* inquiry is "a neutral and nonadversarial proceeding" and, "[b]ecause a defendant is not appointed new counsel," it "is critical that the State's participation at that proceeding, if any, be *de minimis*"). On December 22, 2023, we remanded for a new preliminary *Krankel* inquiry, by a different judge and without the State's participation, while retaining jurisdiction to consider, if necessary, the merits of the other issues raised in this appeal.

¶ 51    Mr. Armstrong represented himself during that proceeding on June 28, 2024. He was given the opportunity to present witnesses and question his trial counsel under oath. The State did not participate, and the trial court ultimately concluded that Mr. Armstrong's claims lacked merit, such that no further proceedings were necessary. We granted Mr. Armstrong leave to supplement the record on appeal with the transcript from that proceeding and, upon review of it by his appellate counsel, he has elected not to amend his opening brief. Mr. Armstrong now asks this court to review and decide the remaining issues raised in his appeal.

¶ 52                                    II. JURISDICTION

¶ 53    The trial court denied Mr. Armstrong's motion to reconsider his sentence on April 27, 2021. On June 28, 2021, this court permitted Mr. Armstrong's *pro se* late notice of appeal and appointed him appellate counsel. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. March 12, 2021), governing appeals from final judgments in criminal cases.

¶ 54                                    III. ANALYSIS

¶ 55            A. Mr. Armstrong's Claim that He Was Denied a Fair Trial

¶ 56    We first address Mr. Armstrong's argument that he was denied a fair trial due to the trial court's improper reliance on irrelevant facts and evidence outside the record. Specifically, Mr. Armstrong highlights the trial judge's comments regarding (1) the victim's character and conduct,

17

(2) the location of the crime scene, and (3) the judge's own military experience. Whether a trier of fact's reliance on matters outside the record constitutes a violation of the defendant's due process rights is a question we review *de novo*. *People v. Pellegrini*, 2019 IL App (3d) 170827, ¶ 64.

¶ 57 The State argues that Mr. Armstrong forfeited this issue by failing to object at trial or include it in his post-trial motion. Mr. Armstrong's response is that we may consider the issue as first-prong plain error because the "evidence is so closely balanced that the error alone threatened to tip the scales of justice against [him], regardless of the seriousness of the error." *People v. Walker*, 232 Ill. 2d 113, 124 (2009). The first step of a plain-error analysis, however, is to determine whether any error occurred at all (*People v. Lopez*, 2012 IL App (1st) 101395, ¶ 64), and here we are simply not convinced that one did.

¶ 58 It is true that "[a] determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law." *People v. Wallenberg*, 24 Ill. 2d 350, 354 (1962). It is presumed, however, that the judge in a bench trial has considered only competent evidence, a presumption that is rebutted only "where the record affirmatively shows the contrary." *People v. Barham*, 337 Ill. App. 3d 1121, 1135 (2003). The comments made on the record by the trial judge in this case do not rise to this level.

¶ 59 Mr. Armstrong insists that the trial judge here "made clear from the start that [he] would be considering improper evidence outside the record" when he prefaced the announcement of his findings by noting that he had applied his life experiences in acting as the trier of fact in this case. Due process does not permit a judge acting as the trier of fact to go outside the record (other than as to matters subject to judicial notice), or to "conduct a private investigation in a search for aids to help him make up his mind about the sufficiency of the evidence." *People v. Yarbrough*, 93 Ill.

2d 421, 429 (1982). However, a judge is certainly permitted to consider his or her "own life and experience in ruling on the evidence." (Internal quotation marks omitted.) *People v. Johnson*, 2023 IL App (4th) 220201, ¶ 59. Indeed, that is precisely what jurors are instructed to do. See Illinois Pattern Jury Instructions, Criminal, No. 1.01 (approved Apr. 30, 2021) (directing jurors to "consider all the evidence in the light of your own observations and experience in life").

¶ 60    To the extent that this judge did more than consider the evidence in light of his own life experience, his consideration of matters outside the record would only require reversal if there was evidence that it actually prejudiced the outcome, *i.e.*, that it "misled or entered into the trial court's determination." *People v. Banks*, 102 Ill. App. 3d 877, 882 (1981). There is simply no evidence that this occurred.

¶ 61    The judge's statements here about the victim in this case, Mr. Dixon—that he was "somebody's son, somebody's father, and somebody's boyfriend," and that he "manned up" when he jumped up from the bed to confront his shooter—were part of a lengthy narrative the judge delivered before making his findings of guilt. There is nothing to suggest that these passing remarks recognizing the victim's humanity are what caused the judge to find Mr. Armstrong guilty.

¶ 62    Nor do we find that the judge's comments in this case, drawn from his military experience, regarding the caliber of various bullets and how much blood would be anticipated at the scene, denied Mr. Armstrong a fair trial. In speculating why so little of the victim's own blood was found at the scene, the judge seems to have been attempting to puzzle out why the detectives did what they did here—why they suspected that the blood in the hallway was not the victim's and took the step of collecting it for testing. But it does not matter why the detectives did what they did. The testing showed that the blood was Mr. Armstrong's, and it is that critical fact that led to the court's findings of guilt.

¶ 63    The judge's comment that perhaps Mr. Armstrong changed his clothes, which would explain why he did not have "a lot more blood on [him]" when he arrived at the hospital, was one reasonable inference that could be drawn from the evidence presented at trial, including Ms. Dlugopolski's testimony that she did not recall Mr. Armstrong arriving at the hospital dressed all in black. A guilty verdict may be supported by not only the evidence itself but also any reasonable inference that may be drawn from the evidence. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004).

¶ 64    We have reviewed the transcripts in their entirety. We agree with Mr. Armstrong that the trial judge here was prone to expounding on the record, sometimes veering into irrelevant matters. He observed at one point, for example, that the scene of the crime was only a mile-and-a-half from President Obama's house in Chicago. But nothing in our own review or in Mr. Armstrong's arguments suggests that these stray comments played any role in the court's ultimate determination that the elements of the offenses the State had charged Mr. Armstrong with were met here beyond a reasonable doubt. Rather, these were "benign rhetorical comments that did not serve as a basis for the court's determination." *People v. Thomas*, 364 Ill. App 3d 91, 101 (2006).

¶ 65    The court's comments here are quite different from those in the cases Mr. Armstrong relies on. The trial judge in *People v. Kennedy*, 191 Ill. App. 3d 86, 91 (1989), for example, "classified the defense witnesses as thieves, drug addicts, fornicators and welfare recipients," assessments that were not based on any evidence in the record and which caused the judge "to reject [the] defendant's alibi defense without due consideration." *Id.* We concluded that the judge must either have made improper assumptions about the witnesses based on their appearances or relied on information outside the record to evaluate their credibility. *Id.*

¶ 66    The judge in *People v. Jackson*, 409 Ill. App. 3d 631, 649-50 (2011), rejected the

defendant's insanity defense in part based on his personal belief, unsupported by any evidence, that medications the defendant received while incarcerated were given to him prophylactically and not to treat any mental illness. The judge also extensively cross-examined the defendant's expert witness in an argumentative and hostile way that we concluded "showed a disregard and unfavorable bias" toward that witness's testimony. *Id.* at 649.

¶ 67    In *Wallenberg*, 24 Ill. 2d at 354, although the State had not introduced any evidence to rebut the defendant's testimony that there were no gas stations on the route he traveled, the judge said, "I happen to know different," and "I don't believe his story." This was evidence outside the record that was critical to an issue in the case.

¶ 68    In each of these cases, the presumption that the trial judge had only considered the admissible evidence presented at trial to decide the case was affirmatively rebutted. The judges did more than make extraneous comments about things that had no real bearing on the issues before them; they considered evidence outside the record to make factual determinations about issues in the case or to assess the credibility of witness testimony. None of that occurred in this case.

¶ 69    In sum, Mr. Armstrong has failed to point to anything in the record on appeal that rebuts the presumption that the trial judge only considered competent evidence produced at trial in finding him guilty of first degree murder and home invasion.

¶ 70        B. Mr. Armstrong's Attempt to Revoke his Waiver of Counsel at Sentencing

¶ 71    Mr. Armstrong next argues that the trial court abused its discretion when it refused to allow him to revoke his waiver of counsel at sentencing. The sixth amendment entitles a defendant to both the representation of counsel at all critical stages of criminal prosecution—including sentencing—and, conversely, the right to knowingly and intelligently waive counsel and represent himself *pro se*. *People v. Burton*, 184 Ill. 2d 1, 21-22 (1998). A waiver of counsel, once made, will

remain in effect throughout all phases of trial unless circumstances suggest it was limited to a particular stage of proceedings or a later request for counsel is made. *People v. Baker*, 92 Ill. 2d 85, 95 (1982).

¶ 72　Mr. Armstrong was represented by private counsel at his bench trial. Following the court's findings of guilt, however, he knowingly and intelligently waived his right to counsel for post-trial proceedings, including sentencing. The record demonstrates that the trial court took great pains to ensure that Mr. Armstrong knew what he was doing. It admonished him repeatedly, at several hearings held over a period of months, regarding the range of sentences he faced, that he was entitled to appointment of a public defender and the knowledge and skill a lawyer from the public defender's office would bring to bear on those important proceedings, and the added difficulties he could face if self-represented. The court had the public defender who would be assigned to the matter, as well as that person's supervisor, meet with Mr. Armstrong to ensure that he made a properly informed decision. The court warned everyone involved, "once this is done, it's done." Despite all of this, Mr. Armstrong was adamant that he wished to proceed *pro se*.

¶ 73　Mr. Armstrong disputes none of this on appeal. His argument is that when he changed his mind and sought to revoke his waiver of counsel at sentencing, it was error for the trial court to refuse him a lawyer at that time. Mr. Armstrong acknowledges that he did not raise this error below but argues that we may review it as second-prong plain error—an error "so serious that it affected the fairness of the defendant's trial or challenged the integrity of the judicial process." (Internal quotation marks omitted.) *People v. Howard*, 376 Ill. App. 3d 322, 336 (2007). Again, however, "[w]ithout reversible error, there can be no plain error" (*People v. McGee*, 398 Ill. App. 3d 789, 794 (2010)), and we agree with the State that under the circumstances present here, it was not error for the trial court to deny Mr. Armstrong's request.

¶ 74    A criminal defendant's right to revoke a waiver of counsel is not absolute. *People v. Pratt*, 391 Ill. App. 3d 45, 52-53 (2009). The trial court has the discretion to deny such a request under appropriate circumstances, and the decision to do so is reversible error only where it is an abuse of discretion (*id.*), *i.e.*, "where the court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court" (*People v. Baez*, 241 Ill. 2d 44, 106 (2011)).

¶ 75    The State initially argues that when Mr. Armstrong asked if it was "too late to get an attorney," he was not making a clear, unequivocal, and unambiguous request for the assistance of counsel. *Burton*, 184 Ill. 2d at 20-21, the case the State relies on for these criteria, however, involved a request to waive counsel in the first instance, not a request to revoke an earlier waiver of counsel. The distinction is an important one. As the *Burton* court noted, " '[c]ourts must indulge in every reasonable presumption against waiver' of the right to counsel." *Id.* at 23 (quoting *Brewer v. Williams*, 430 U.S. 387, 404 (1977)). That of course means, as we made clear in *People v. Griffin*, 305 Ill. App. 3d 326, 330 (1999), that "a reviewing court should make all reasonable presumptions *in favor of* a revocation" of the waiver of the right to counsel. (Emphasis added.) Mr. Armstrong's inquiry was more than sufficient as a request to revoke his prior waiver of counsel.

¶ 76    The State is correct, however, that timing is an important consideration when assessing whether the denial of a request to revoke a waiver of counsel was an abuse of discretion. This court held, in *People v. Trump*, 38 Ill. App. 3d 44, 46 (1976), for example, that it was not an abuse of discretion to deny the defendant's request to revoke his waiver of counsel where trial had already begun, and the State had questioned its first witness. "[C]ompetent representation would have required that the proceedings be suspended," we reasoned, either to declare a mistrial and begin

anew, or for appointed counsel to become acquainted with the facts of the case and review a transcript of the testimony already heard. *Id.* Either alternative "would necessitate an unwarranted delay" and allow the defendant to "effectively thwart the orderly administration of justice." *Id.*

¶ 77    We reached the opposite conclusion in *People v. Palmer*, 382 Ill. App. 3d 1151, 1162-63 (2008), where the defendant's request to revoke his waiver of counsel was made for the first time in a motion to reconsider his sentence. That request was not untimely, we concluded, because it was made "at a new stage of the proceedings which constituted a clean slate for the trial court's consideration of the issue." *Id.* at 1163.

¶ 78    Here, sentencing began in person on March 24, 2021, following the court's denial of Mr. Armstrong's motion for a new trial. The State made its arguments in aggravation, and Mr. Armstrong, unprepared despite numerous warnings that sentencing would immediately follow the court's ruling on his motion, was granted a continuance to obtain any witnesses who could offer mitigating evidence. Only when the hearing resumed on March 30, 2021, did Mr. Armstrong ask whether it was too late to obtain counsel. As in *Trump*, granting Mr. Armstrong's request at that juncture would have meant either beginning the proceeding anew or continuing it yet again for a lawyer to be appointed who would then need to become familiar with the evidence presented and the arguments made thus far. As in *Trump*, either option would create unwarranted delay. Post-trial proceedings in this case had already been delayed for the better part of two years while the trial court made sure Mr. Armstrong's decision to proceed *pro se* was an informed one, addressed his claims of ineffective assistance of trial counsel, and gave him extensive leeway to prepare his *pro se* arguments. The victim's family, who wished only to be present for the conclusion of the sentencing hearing, when the judge announced the sentence, had already made arrangements to be present that day in accordance with the court's COVID-19 social distancing protocols.

¶ 79 Under all the circumstances present here, we cannot say it was an abuse of discretion for the trial court to deny Mr. Armstrong's request to revoke his waiver of counsel made after the sentencing hearing had begun.

¶ 80 We find Mr. Armstrong's reliance on the delay between a waiver of counsel and sentencing and the court's decision in *Schell v. United States*, 423 F. 2d 101 (1970), to be misplaced. The defendant in *Schell* was a youthful offender (20 years old) who waived his right to counsel and pleaded guilty after being given inaccurate information regarding the maximum sentence he faced. *Id.* at 101. While released on his own recognizance during the six months between the plea and sentencing, the defendant violated the terms of his release, thus changing the posture of the case going into sentencing. *Id.* at 102-03. Under these circumstances—and not simply because there had been a significant delay—the court concluded that the defendant's waiver should no longer be deemed effective, and his conviction and sentence must be set aside. *Id.* at 103. Here, by contrast, there were no changed circumstances, the delay was primarily attributable to accommodations made for Mr. Armstrong's benefit, and Mr. Armstrong appeared and represented himself *pro se* many times in the months between when he waived his right to counsel and when he was sentenced, never once indicating that he had had a change of heart.

¶ 81 C. Sufficiency of the Evidence Supporting Mandatory Firearm Enhancements

¶ 82 We next address Mr. Armstrong's argument that the State presented insufficient evidence to establish beyond a reasonable doubt that he was the shooter in this case. Mr. Armstrong's 75-year sentence for first degree murder and his consecutive 50-year sentence for home invasion each include a mandatory 25-year enhancement for "personally discharg[ing] a firearm that proximately cause[d] great bodily harm, permanent disability, permanent disfigurement, or death to another person." 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2020); 720 ILCS 5/19-6(c) (West 2020).

Mr. Armstrong argues that these should each be reduced to 15 years, the enhancement applicable where an offender was merely armed with a firearm during the offense (730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2020); 720 ILCS 5/19-6(c) (West 2020)) because the State failed to prove beyond a reasonable doubt that, of the two armed and masked perpetrators, he was the shooter.

¶ 83    Due process "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." (Internal quotation marks omitted.) *People v. Greco*, 204 Ill. 2d 400, 407 (2003). "When the sufficiency of the evidence supporting a criminal conviction is challenged, '[t]he relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.' " *People v. Ramos*, 2020 IL App (1st) 170929, ¶ 57 (quoting *People v. Ward*, 215 Ill. 2d 317, 322 (2005)). This same standard applies when the sufficiency of the evidence supporting a sentencing enhancement is challenged. *People v. Trzeciak*, 2014 IL App (1st) 100259-B, ¶ 57). "It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *People v. Gray*, 2017 IL 120958, ¶ 35. As the reviewing court, we do not decide the issue anew. *Id.* We will find that the evidence was insufficient to support a conviction only if it is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 84    Here, Ms. Banks and Ms. Mills testified at trial that two masked men entered the apartment, but that they saw only one of them shoot Mr. Dixon. The second man was never identified. Evidence was presented at trial that the trial judge could have rationally relied on to find that Mr. Armstrong was the person described by both of these witnesses as having shot Mr. Dixon.

¶ 85     First, there was a trail of blood matching Mr. Armstrong's DNA that led from the front

door of the apartment to the bedroom where Mr. Dixon was killed. Both of the eyewitnesses testified that this blood was not there when they entered the apartment—just hours before in the case of Ms. Mills, and just minutes before in the case of Ms. Banks. And Mr. Armstrong sought treatment for a gunshot wound he could not explain just one hour after the shooting. A reasonable inference from this evidence is that Mr. Armstrong was one of the two men who entered the apartment just prior to the shooting.

¶ 86    Second, Mr. Armstrong matched the eyewitnesses' description of the person they saw shoot Mr. Dixon as being the heavier-set of the two masked men who entered the apartment. Ms. Mills described the shooter as "kind of heavyset." Ms. Banks described him as "a bigger guy," adding that he was "[f]airly light skinned." The other man, she testified, was "a thin guy with darker skin." The still photographs taken from the apartment surveillance footage that were entered into evidence are consistent with those descriptions of the two men. And the photographs of Mr. Armstrong taken by Officer Hollingsworth when he collected Mr. Armstrong's DNA sample depict someone stocky and heavyset, not thin, and who has relatively light skin. A reasonable inference from this evidence is that, of the two men, Mr. Armstrong was the one that Ms. Mills and Ms. Banks observed shooting Mr. Dixon.

¶ 87    Mr. Armstrong argues that Ms. Banks's belief that the stockier individual was also the taller of the two men was contradicted by Sergeant Ryan's testimony that the surveillance footage showed it was the thinner man who was taller. Of course, Sergeant Ryan's view of the two men side by side on the surveillance tape was different than the view Ms. Banks had of them in the apartment, where she observed them standing in separate rooms. Moreover, even if Ms. Banks's testimony that the shooter was taller was contradicted, this does not change the fact that the women were both clear that the person they saw shoot Mr. Dixon was the more heavy-set of the two men.

"Minor discrepancies and inconsistencies only go to the weight to be given the testimony." *People v. Cooper*, 69 Ill. App. 2d 18, 21 (1966).

¶ 88    Mr. Armstrong finds fault with the trial court's further inferences that the shooter injured himself with his own gun, put his hand in his pocket to conceal his wound, changed his clothing, and sought treatment at a hospital that was not the closest to the scene of the crime in order to distance himself from the crime scene. But this was simply the trial judge thinking out loud, considering each piece of evidence to see whether it contradicted the inferences he had already reached based on the evidence outlined above. They are not what makes the court's finding of guilt sufficient on appeal. Rather, the trail of Mr. Armstrong's blood from the entrance of the apartment to the bedroom door, the eyewitness testimony, and Mr. Armstrong's appearance at a hospital shortly after the shooting with an unexplained gunshot wound to the hand are, taken together, more than sufficient to support the finding that Mr. Armstrong was the person the witnesses saw shoot Mr. Dixon.

¶ 89    As the State points out, although the witnesses only saw one man shoot Mr. Dixon, the evidence in fact indicated that both of the men who entered the apartment shot him, making the testimony concerning the physical appearances of the men somewhat irrelevant. Ms. Banks testified that both men were armed, and the stipulated ballistics evidence revealed that the two bullets lodged in Mr. Dixon's body were of a different caliber than the five fired bullet cases found near his body, which it is reasonable to infer were from the bullets responsible for the other gunshot wounds to his body. The State posits that, rather than failing to appreciate this evidence, the trial court was simply not concerned with whether there was a second shooter. The question before the court, after all, was whether Mr. Armstrong was *a* shooter, not whether he was the only shooter.

¶ 90    Mr. Armstrong insists in his reply brief that if there were in fact two shooters, then the

28

State failed to prove that he was the one who fired the gun whose bullets remained lodged in Mr. Dixon's body. But the State did not need to prove that; it needed to prove that Mr. Armstrong fired a gun that either contributed to Mr. Dixon's death by multiple gunshot wounds or at the very least caused him great bodily harm. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2020); 720 ILCS 5/19-6(c) (West 2020). Under either a one-shooter theory or a two-shooter theory, the evidence at trial was more than sufficient to conclude beyond a reasonable doubt that Mr. Armstrong shot Mr. Dixon.

¶ 91    In sum, Mr. Armstrong has given us no cause to doubt the sufficiency of the evidence supporting the trial court's finding that he personally discharged a firearm that proximately caused Mr. Dixon death or great bodily harm.

¶ 92                    D. Mr. Armstrong's 125-Year Sentence

¶ 93    Finally, Mr. Armstrong challenges his 125-year sentence as excessive, arguing both that the trial court considered improper factors in aggravation and that it failed to properly consider his rehabilitative potential.

¶ 94    The court is given broad discretion when imposing a sentence, with great deference given to the imposed sentence. *People v. Elizondo*, 2021 IL App (1st) 161699, ¶ 112. Such deference is appropriate because the sentencing court is in a better position than the appellate court to evaluate the defendant's credibility, habits, demeanor, social environment, mentality, and moral character. *People v. Boyd*, 2021 IL App (1st) 182584, ¶ 75. Where a defendant challenges a sentence that is within the statutory range for the offense, we will not disturb that sentence absent an abuse of discretion. *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16. And we will find an abuse of discretion only where a sentence is "greatly at variance with the spirit and purpose of the law" or "manifestly disproportionate to the nature of the offense." *Id.*

¶ 95    Whether the court relied on an improper sentencing factor, however, is a question of law

we review *de novo*. *People v. Maurico*, 2014 IL App (2d) 121340, ¶ 15. Where an improper factor was considered, we will only affirm the sentence if we "can determine from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence." *People v. Heider*, 231 Ill. 2d 1, 21 (2008).

¶ 96    Relying on *Maurico*, 2014 IL App (2d) 121340, Mr. Armstrong argues that the trial court improperly considered the personal traits of the victim, Mr. Dixon, referring to him as "pure" and a "hero." The sentencing court in *Maurico* noted that the victim in that case "was a member of the greatest generation, a World War II veteran," and "a very, very fine man, who was a great value to his family and society," and for whom the court had "the utmost respect." *Id.* ¶ 8. We concluded there that the court's implication "was as improper as it was unmistakable: because [the victim] was 'a very good man,' [the] defendant's crime was more serious than it otherwise would have been." *Id.* ¶ 20.

¶ 97    We believe the court's comments here are distinguishable from those in *Maurico*. Having reviewed the transcripts in their entirety, it is clear to us that when the court referred to Mr. Dixon as "one of the purest victims [the] Court ha[d] seen," it was not because Mr. Dixon, whom the witnesses agreed was a drug dealer, was somehow morally pure, but because his status as a victim was pure. He could in no way be considered an aggressor, as he was, according to the court, "awakened from a safe place in a home with a friend." The court was simply describing the nature and circumstances of *this* crime, an entirely proper consideration at sentencing. See *People v. Hussain*, 2024 IL App (1st) 230471, ¶ 25 (noting that a sentencing court may "properly consider the nature and circumstances of the offense, including the nature and extent of each element of the offense as committed by the defendant" (internal quotation marks omitted)).

¶ 98    Nor did the court improperly consider a factor inherent in the offense of home invasion

when it noted that Mr. Dixon was "awakened from a safe place in a home with a friend." We held in *People v. Titus*, 2022 IL App (3d) 200350-U, ¶ 22, relied on by Mr. Armstrong for this argument, that the sentencing court improperly considered the fact that the defendant in that case had unlawfully entered someone's home as an aggravating factor when that was already an element of home invasion. But the defendant in *Titus* was *only* found guilty of home invasion. *Id.* ¶ 4. Mr. Armstrong was also found guilty of, and separately sentenced for, first degree murder, for which entry into the home was not an element. Moreover, the court focused not on the entry into the home, but on the fact that Mr. Dixon was asleep.

¶ 99  Lastly, Mr. Armstrong argues the trial court failed to give appropriate weight to the fact that he had no prior felony convictions and was a strong candidate for rehabilitation, as evidenced by the fact that he had earned his GED, attended college, was gainfully employed, and had never been involved in a gang. The court noted that with no criminal background whatsoever, the sentence of natural life in prison that the State asked for was not appropriate. The court explained that it reserved such sentences for defendants who had murdered more than once and "had a lifetime of crime." And yet, Mr. Armstrong correctly observes, the court did in fact sentence him to 125 years in prison, certainly the functional equivalent of a natural life sentence.

¶ 100  The sentencing ranges applicable here, absent the firearm enhancements, were 20 to 60 years for first degree murder (730 ILCS 5/5-4.5-20(a) (West 2020)) and 6 to 30 years for home invasion (*id.* § 5-4.5-25(a); 720 ILCS 5/19-6(a)(5), (c) (West 2020)). A mandatory 25-year firearm enhancement applied to each charge (*id.* § 19-6(c); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2020)) and consecutive sentencing was mandatory (*id.* § 5-8-4(d)(1)). Thus, the minimum sentences available to the court—45 years for first degree murder (20 years plus the 25-year enhancement, served at 100%) and 31 years for home invasion (6 years plus the 25-year enhancement, served at

85%)—would still have resulted in Mr. Armstrong spending over 70 years in prison. The reality was that even a minimum sentence would almost certainly be a life sentence. In addition, our criminal code would appear to allow the court to impose a sentence of natural life, since the victim was killed during the course of another felony and the court found that Mr. Armstrong actually caused his death. 730 ILCS 5/5-8-1(a)(1)(b-5)(4)(A)(i) (West 2020).

¶ 101   The result of this sentencing scheme is that the court could not avoid, as it said it wanted to, giving Mr. Armstrong a term that was, in fact, a life sentence. But this was the legislative framework the court had to maneuver within. Within that harsh statutory framework, the court had minimal discretion to exercise. In rejecting a natural life sentence, the court explicitly recognized that there were mitigating facts, mentioning specifically that Mr. Armstrong had no felony record. We simply cannot conclude that the sentences it imposed were an abuse of discretion.

¶ 102                                IV. CONCLUSION

¶ 103   For the above reasons, we affirm Mr. Armstrong's convictions for first degree murder and home invasion.

¶ 104   Affirmed.