2025 IL App (2d) 240375-U
No. 2-24-0375
Order filed June 17, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21-CF-126 |
| CARL JONES, III, | ) ) | Honorable Marcy L. Buick, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Presiding Justice Kennedy and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Trial court did not err in overruling defendant's *Batson* objection; trial court erred in failing to sustain defendant's objection to police officer's testimony that he was near the crime scene because a number of vehicular thefts had previously been reported in that area, but error was harmless; and trial court did not abuse its discretion in denying defendant's request to revoke his waiver of his right to counsel after sentencing hearing had commenced.

¶ 2                                  I. INTRODUCTION

¶ 3    Following a jury trial in the circuit court of De Kalb County, defendant, Carl Jones, III, was convicted of attempted vehicular hijacking and resisting a peace officer. He was sentenced to five years' imprisonment. He now appeals, raising three issues. First, he alleges that the trial court

erred in declining to find that the State exercised a peremptory challenge in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Second, he contends that the trial court should have granted his request to have counsel reappointed prior to his sentencing hearing. Third, he argues that the trial court should not have permitted a police officer to testify that there had been vehicle thefts reported in the vicinity of where defendant was apprehended. For the reasons that follow, we affirm.

¶ 4                                    II. BACKGROUND

¶ 5     Defendant was charged with attempted vehicular hijacking and resisting a peace officer. A jury trial commenced on February 20, 2024, at which defendant was represented by an attorney from the public defender's office. The trial court conducted *voir dire* in groups of four. Juror No. 60, with whom this appeal is concerned, was a member of the first group. He was one of two African Americans in the *venire*. The trial court inquired as required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Juror No. 60 was the first potential juror questioned. The trial court asked whether Juror No. 60 understood and accepted that defendant is presumed innocent. Juror No. 60 replied, "Mmm." The trial court then told Juror No. 60 that he had to say "yes" or "no," and Juror No. 60 stated, "Oh. Yeah." The trial court then inquired whether Juror No. 60 understood and accepted that defendant is not required to produce any evidence on his own behalf. Juror No. 60 answered, "Yeah. Yes." Juror No. 60 replied "yes" to the next two questions required by Rule 431(b) regarding the State's burden of proof and defendant's right to not testify.

¶ 6     After the trial court inquired of the other jurors in the panel of four, the State examined Juror No. 60. It noted that Juror No. 60 had started college and asked whether he was still a student. Juror No. 60 replied, "No, not right now." The State then observed that Juror No. 60 was not employed at the time but had previously worked for a corporation called "Panduit." The State asked if it was pronouncing "Panduit" correctly, to which Juror No. 60 answered, "Yeah." The

State asked Juror No. 60 about the nature of the job, and he replied, "Oh, it's just a warehouse factory job. I just made boxes, taped up the boxes and I shipped boxes." The State stated, "Easy to do, right?" Juror No. 60 answered, "Mmm." Juror No. 60 then replied "no" when asked if he was "doing that anymore." The State inquired whether Juror No. 60 would have any difficulty signing a guilty verdict form if it proved its case, to which Juror No. 60 answered, "No." Finally, the State asked whether Juror No. 60 had any "moral, ethical or religious beliefs that would prevent [him] from sitting on the jury." Juror No. 60 replied, "No." The State then questioned the other prospective jurors in the panel of four.

¶ 7     After it concluded its questioning of the balance of the panel, the State said, "Judge, with thanks we would excuse juror number 60." It accepted the remaining members of the panel. Defense counsel immediately interposed a *Batson* objection outside of the presence of the *venire*. She first observed that Juror No. 60 was one of two African-American individuals in the *venire*. Defense counsel argued that the State briefly questioned Juror No. 60 about their employment status and whether they were in college. She asserted, "it appears that the use of that peremptory challenge may have been merely for their race and not based on any other information that was provided that would distinguish this particular juror in any way that they might exhibit bias or be unfair to the State in this particular case." The trial court found that defendant had made out a *prima facie* case of purposeful discrimination. Thus, the burden shifted to the State to articulate a race neutral reason for its peremptory challenge.

¶ 8     The State first replied that as no pattern of discriminatory peremptory strikes had been shown, defendant has not established a *prima facie* case of purposeful discrimination. It added that Juror No. 60 was the first peremptory challenge it made and it had no way of knowing there was only one more African-American *venireperson*. The State added that it did not "turn around and

look at each and every person" in the *venire*. According to the State, Juror No. 60 "appeared like he did not want to be here."

¶ 9    Defense counsel responded that at the time the *venire* was brought into the courtroom, the attorneys faced the potential jurors and introduced themselves, at which point they viewed the *venire*. Thus, defense counsel reasoned, the State "would have seen the number of African Americans who were present in this pool that was brought into this courtroom." Defense counsel asserted that a pattern was not necessary to establish a *prima facie* case. Moreover, Juror No. 60 did respond to questions appropriately, outside of once or twice having to be reminded to use "yes" or "no" when responding.

¶ 10    The trial court then gave the State an additional chance to address the issue. It stated that when it introduced itself to the *venire*, it did not study each and every person. It denied knowing that there were only two African-American members of the *venire*. The State asserted that the reason it struck Juror No. 60 was "his nonresponsive nature to the question, his demeanor." It continued, "His body language read to me that he did not want to be here, he was not invested in what he was doing."

¶ 11    The trial court then stated that, in retrospect, it was "not clear" that it had heard "enough to establish *** a *prima facie* case." Moreover, it found that "what the prosecutor is stating is a valid reason to exercise a peremptory challenge." The trial judge added, "what I observed with this potential juror was a concern that I had as the judge as to whether this potential juror did, in fact, want to be on the jury." The court continued:

"The juror seemed very reluctant to answer questions. The juror was looking down. The juror was not paying attention from my observations, and I clearly was watching this potential juror because of those red flags that were popping up in my mind. Is the juror

going to listen? The juror was not wanting to respond. I could not hear the juror. The juror was not speaking clearly."

The court stated that it had the same concerns as the State. Juror No. 60 "needed prompting to even be heard and then still did not appear to be interested in being in the courtroom and being called as a juror." It then ruled that, in light of the totality of the circumstances, defendant had not shown purposeful discrimination in the State's decision to exclude Juror No. 60.

¶ 12    At trial, the State's first witness was Joel Aviles. He testified that he works for T-Mobile as an account executive. On Saturday, March 20, 2021, Aviles was working, running a promotional event at a Subway on Sycamore Road in De Kalb. Two other T-Mobile employees were also present. They had a table set up on the sidewalk outside of the Subway. At about 11 a.m., Aviles observed an individual dressed in all black walking on the sidewalk. The person was wearing a black hoodie with the hood up, a black mask, black jeans, and black shoes. The person walked past Aviles out of his line of sight and then approached Aviles again. Aviles identified defendant as the person dressed in all black. Aviles spoke with defendant, giving him his "sales pitch." Defendant said that he might be interested, so Aviles asked for an identification card from defendant so he could sign defendant up for the promotion. Defendant got "nervous and then backed away."

¶ 13    Aviles testified that defendant walked in the direction from which he had come, and Aviles started speaking to another potential customer, the victim. Defendant approached the victim's car and started to "very, very, very slowly" get in. Aviles asked the victim, "Hey, is that your car?" The vehicle was a white Jeep. The victim "turned around and tried to go after the vehicle," which was only a few feet away. Defendant put the vehicle in reverse, while the victim told him to get out and tried to pull him out of it. Defendant struck the victim, and the victim attempted to enter the vehicle. Aviles saw the victim try to shift the gears of the vehicle. Defendant tried to drive

away, revving the engine, but the vehicle was apparently no longer in reverse. Defendant exited the vehicle through the passenger-side door.

¶ 14    Defendant ran through the parking lot, and the victim followed in the Jeep. Aviles, who had called the police, ran after them, relaying to the police what was transpiring. Aviles stated that once "they reached the end of the parking lot, the vehicle was abandoned, and then once the vehicle was abandoned, the two of them were fighting in a ditch." He clarified that the ditch was actually across the street. A police officer arrived and asked Aviles who the offender was. Aviles directed the officer across the street and pointed out defendant. The officer attempted to pull defendant off the victim. An off-duty officer arrived shortly thereafter and assisted in taking defendant into custody. Aviles saw defendant strike the officer "a couple of times." Aviles recorded the events on his phone and turned over the video to the police. Aviles's manager also recorded the offense. Both videos were played for the jury.

¶ 15    On cross-examination, Aviles acknowledged that when he spoke with defendant, defendant's hood was up and he was wearing a mask, though he could see defendant's eyes. There was water in the ditch in which the victim and defendant were fighting. While the officers were wrestling with defendant, a woman, who was a nurse, arrived. On redirect-examination, Aviles testified that during the fighting, defendant's mask kept slipping down, and defendant would pull it back up. He could see defendant's face at several points during the events.

¶ 16    The State next called Jamie Fontanez. She testified that she is an intensive care nurse. On March 20, 2021, at about 11 a.m., she was in the parking lot of Kay Jewelers with her children. They were in her car. Kay Jewelers is near the Subway at which the events at issue in this case occurred. She observed a person in a white Jeep chasing a person on foot. Someone was yelling, "He tried to steal my car. Help." The person on foot was wearing all dark colors, and his head was

covered. She identified defendant as this person. Eventually, the two individuals started fighting. Fontanez called the police. A police officer arrived. Defendant was on top of the victim, and the officer instructed defendant to stop and put his hands behind his back. Defendant did not comply. The officer grabbed defendant, and defendant continued to struggle. An off-duty officer arrived and assisted in taking defendant into custody. Fontanez went through defendant's pockets while the police were trying to subdue him to see if he had any weapons. She did not see anything prior to observing the Jeep chasing the man on foot. On cross-examination, she stated that she did not recall if she removed anything from defendant's pockets. In her initial 911 call, Fontanez said defendant was wearing a baseball cap, which, she explained on redirect-examination, was an observation she made from a considerable distance.

¶ 17    The State's next witness was Angela Camacho. She was employed by T-Mobile as a manager, and she was present at Subway during the events at issue here. A white Jeep pulled up, and the driver approached where she was working. He spoke with Aviles. Aviles said to the driver, "Hey, isn't that your car?" At that point, defendant was getting into the Jeep. The driver approached, told defendant to get out, opened the door, and got control of the vehicle. Defendant exited the other side of the Jeep. Defendant was dressed all in black. Defendant then "ran off." The driver followed. Aviles followed both of them. The driver caught up with defendant, and the two men fought. The police arrived and split them up. On cross-examination, Camacho testified that at the time of these events, "we were wearing masks, but this was a time where we were outdoors so there were rules that people could or could not wear a mask."

¶ 18    Sonny Streit, a detective with the De Kalb Police Department, next testified for the State. In March 2021, Streit was a patrol sergeant. On March 20, 2021, at about 11 a.m., he was dispatched regarding a "robbery in progress" to the area where the incident at issue here occurred.

Streit happened to be across the street from the Subway where the incident commenced. The dispatcher then related that the suspect was believed to have robbed Kay Jewelers. The State asked why Streit was in the "general area." He replied, "We had received a couple of vehicular thefts in the area over the last week or month and." Defense counsel immediately objected, stating that it appeared the officer was referring to "other acts as if somehow my client is involved." The trial court overruled the objection, explaining that Streit's testimony was "an explanation of why he's there." It added, "At this point, there should be no further inquiry made as to other questions about that." Streit drove to Kay Jewelers, and was directed to where the driver and defendant were fighting. He pulled up within a few feet of them. Aviles told Streit that the individual wearing black was the offender. Streit instructed defendant to place his hand behind his back, but defendant continued to struggle with the victim. Streit grabbed defendant's arm, which allowed the victim to break free. Streit asked the victim to hold defendant's legs, and the victim did so. Defendant fell on top of Streit, who then held him, with the victim's assistance, until more officers arrived. Defendant was taken into custody. Following the incident, Streit interviewed the victim, who confirmed he was the owner of the white Jeep.

¶ 19 On cross-examination, Streit testified that when he arrived, there was a fight in progress and that his concern was to separate the individuals and stop the violence. While he was struggling with defendant, a female arrived and, of her own volition, searched defendant's pockets.

¶ 20 After Streit's testimony concluded, the State rested. Defendant made a motion for a directed verdict, which was denied. Defendant called no witnesses. The jury found defendant guilty of attempted vehicular hijacking and resisting a peace officer.

¶ 21 On March 20, 2024, defense counsel filed a motion for judgment notwithstanding the verdict and a new trial. In it, she first argued that the trial court failed to conduct a proper hearing

on her *Batson* objection and that the trial court's ruling on that objection was erroneous. Second, she asserted that the trial court improperly limited her cross-examination of Streit. Third, she argued that the trial court erred in not sustaining her objection to Streit's testimony that he was in the area investigating vehicular thefts.

¶ 22     On May 6, 2024, defense counsel filed a motion to withdraw, asserting that defendant no longer wished her to represent him. The trial court granted the motion to withdraw, and, after inquiring of and admonishing defendant, granted his request to proceed *pro se*. The trial court inquired as to defendant's age and level of education, which defendant stated was 30 and the senior year of college. Defendant denied having any mental disability or mental health issues that affected his ability to understand the proceeding. The trial court warned defendant that he would be required to adhere to rules concerning the conduct of legal proceedings and that this might put him at a disadvantage relative to the State, which is represented by an experienced attorney. The trial court emphasized that defendant would be held to the same rules of procedure as an attorney. The trial court then added, as defendant had other charges pending, "And for the cases that are still pretrial, in the event that the Court accepts your decision to represent yourself, you will not be given the opportunity to change your mind during a jury trial." The trial court then reviewed the charges that remained pending, as well as their possible penalties. The trial court inquired, "Do you still wish to give up your right to have an attorney represent you in all of these very serious cases?" Defendant responded affirmatively. The trial court again reviewed the role of an attorney with defendant. It reiterated that it had previously found defendant fit. It then found that defendant's "waiver of his right to be represented by an attorney is knowing, intelligent, [and] voluntary."

¶ 23     Defendant filed a *pro se* posttrial motion. In it, he alleged that the State suppressed exculpatory evidence and, in a separate motion, he raised the effectiveness of trial counsel.

Defendant objected to portions of the presentencing investigation report as well. He moved for a change of venue regarding the charges that remained pending. Defendant also adopted the posttrial motion filed by his previous attorney. The trial court denied defendant's motions, in the course of which, it found that defendant had not established a *prima facie* case of discrimination regarding the *Batson* issue. It explained, "There was no pattern of strikes against minority *venire* persons, and it is not necessary to go further in the analysis, because defendant failed to make that *prima facie* showing." Additionally, the court found that the State had articulated a race-neutral basis for its use of the peremptory strike on Juror No. 60.

¶ 24    A hearing was held on June 17, 2024, at which the trial court first announced its above referenced decisions regarding defendant's pending posttrial motions. The matter then proceeded to the sentencing hearing. The trial court first inquired whether defendant was under any mental or physical disability or under the influence of drugs or alcohol such that his ability to understand the proceeding was affected. Defendant replied negatively. The trial court then asked whether defendant was taking any prescription medication that affected his ability to understand the proceeding. Defendant answered, "No, but I would like some representation before we proceed with the sentencing hearing." The trial court noted that defendant had fired the Public Defender's Office, and defendant stated that he "would like to hire another one." Defendant added, "I have no experience." The trial court reminded defendant that he had elected to proceed *pro se* after "a very lengthy admonition hearing." Defendant replied, "It's just obvious I have no experience whatsoever." He added, "I just merely needed to address some matters that I know my attorney— former Attorney Dietrich would not address at my request." The trial court denied defendant's request. The trial court then asked whether defendant was prescribed any medications that he was not taking that would affect his ability to understand the proceeding, and defendant stated that he

was not. At one point during the hearing, the trial court asked defendant if he wanted to make a statement in allocution, to which he replied, "I don't understand that, which is why I asked to have some form of representation, but you denied that." The trial court sentenced defendant to five years' imprisonment. Defendant now appeals.

¶ 25                                             III. ANALYSIS

¶ 26     On appeal, defendant raises three issues. First, he contends that the trial court erred in finding that the State did not commit a *Batson* violation. Second, he argues that the trial court erred in permitting a police officer to testify that he was nearby because there had been reports of vehicular thefts in the area. Third, he asserts that the trial court erred in denying his request for counsel during the sentencing hearing. We find none of these contentions persuasive.

¶ 27                                          A. *Batson* Violation

¶ 28     Defendant first contends that the trial court erred in not finding that the State committed a *Batson* violation. In *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), the United States Supreme Court held that the equal protection clause (U.S. Const., amend. XIV) of the federal constitution prohibits the State from using peremptory challenges based on race. There, the Court established a three-step procedure to assess claims of discrimination during *voir dire*.

¶ 29     The first step requires a defendant to make a *prima facie* showing that would allow the trial judge to draw an inference that discrimination had occurred. *People v. Davis*, 231 Ill. 2d 349, 360 (2008). It bears emphasizing that "the threshold for making out a *prima facie* claim under *Batson* is not high." *Id*. Relevant factors include the following:

> " '(1) racial identity between the [party exercising the peremptory challenge] and the excluded venirepersons; (2) a pattern of strikes against African-American venirepersons; (3) a disproportionate use of peremptory challenges against African-American

venirepersons; (4) the level of African-American representation in the venire as compared to the jury; (5) the prosecutor's questions and statements [of the challenging party] during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogenous group sharing race as their only common characteristic; and (7) the race of the defendant, victim, and witnesses.' " *People v. Rivera*, 221 Ill. 2d 481, 501 (2006) (quoting *People v. Williams*, 173 Ill. App. 3d 48, 71 (1996)).

The existence of a pattern of discriminatory strikes is but one factor for the trial court to consider and is not, in itself, dispositive. *People v. Shaw*, 2014 IL App (4th) 121157, ¶ 25.

¶ 30    If a defendant succeeds in establishing a *prima facie* case of discrimination, the inquiry moves to the second step, where the State is given an opportunity to articulate a race-neutral reason for its decision to exercise the peremptory in question. *Id.* ¶ 19. "Race neutral" means some reason not related to the race of the potential juror. *Hernandez v. New York*, 500 U.S. 352, 360 (1991). If the State does so, the defendant is given an opportunity to rebut the proffered basis as pretextual. *Shaw*, 2014 IL App (4th) 121157, ¶ 19.

¶ 31    After the parties are given these opportunities, the trial court must, during the third step, "determine whether the defendant has shown purposeful discrimination in light of the parties' submissions." *Davis*, 231 Ill. 2d at 363. This "involves an evaluation of the prosecutor's credibility, and the best evidence of discriminatory intent will often be the demeanor of the attorney who made the peremptory challenge." *Id.* (citing *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)). Furthermore, "a race-neutral reason for a challenge often invokes a juror's demeanor (*e.g.,* nervousness, inattention, the way words are emphasized to express differing meanings), making the trial court's firsthand observations of crucial importance." *Id*. at 363-64. Hence, "the

trial court must evaluate not only whether the prosecutor's demeanor belies discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Id.* at 364 (citing *Snyder*, 552 U.S. at 477). A person's demeanor requires a subjective assessment and thus should be given "close scrutiny." *Mack v. Anderson*, 371 Ill. App. 3d 36, 48 (2006). "It is well settled that a prospective juror's courtroom demeanor may constitute a legitimate race-neutral reason for excluding that individual." *Id.* at 59.

¶ 32     Obviously, the trial court is in a superior position to observe the demeanor of both the potential jurors and the attorney who exercised the peremptory. *People v. Baisten*, 203 Ill. App. 3d 64, 80 (1990). Therefore, a trial court's finding on a *Batson* objection generally will not be overturned unless it is clearly erroneous. *People v. Trejo*, 2022 IL App (2d) 190424-B, ¶ 8. Moreover, a trial court's "specific observations of record bearing on demeanor or credibility[] will be accorded deference." *Davis*, 231 Ill. 2d at 364. To the extent that defendant challenges the procedures used by the trial court in addressing his *Batson* objection, review is *de novo*. *People v. Talley*, 2013 IL App (4th) 221013, ¶ 24. The burden is on the party interposing the *Batson* objection to establish purposeful discrimination. *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

¶ 33     Here, defendant interposed a *Batson* objection, arguing that none of Juror No. 60's answers during *voir dire* indicated any bias towards the State. The trial court initially (during the first stage), with little explanation, found that defendant had made out a *prima facie* case of discrimination and stated that the burden had shifted to the State to articulate a race-neutral reason for its decision to strike Juror No. 60. The State, during the second stage, asserted that it did not know that there were only two African Americans in the *venire*. It added that that Juror No. 60 was unresponsive to questions and that it appeared that he did not want to be there. Defense counsel noted that the prosecutor had observed the *venire* when it introduced itself to the potential jurors. The State, given

an additional opportunity to respond by the trial court, reiterated that it did not know how many African Americans were in the *venire* and stated it would not "have discharged him because he was Black." Further, the State asserted, it exercised the peremptory because of Juror No. 60's "nonresponsive nature to the question [and] his demeanor." It added that his "body language" indicated "that he did not want to be here."

¶ 34     The trial court subsequently questioned whether defendant had set forth a *prima facie* case of discrimination, stating that it was "not clear" that it had heard "enough to establish *** a *prima facie* case." Nevertheless, the court moved to the third stage of the inquiry, and found that defendant had not established that the State's decision to strike Juror No. 60 constituted purposeful discrimination. The trial court noted that it shared some of the State's apprehensions regarding this juror. The court stated it was concerned that Juror No. 60 did not want to be on the jury. It noted that he was "very reluctant to answer questions," explaining that he was "looking down" and "was not wanting to respond." The trial court further noted that Juror No. 60 "was not speaking clearly and that it "could not hear the juror." The trial court stated that Juror No. 60 "needed prompting to even be heard." Because the trial court actually conducted the third stage of the *Batson* inquiry, we will assume for the purposes of resolving this appeal, that it found defendant had established a *prima facie* case of discrimination, despite the trial court's apparent retreat from its initial finding.

¶ 35     Initially, defendant argues that the State's articulated reasons for excusing Juror No. 60 were not sufficiently defined to satisfy its burden in the second stage of *Batson* analysis. We note that the State's explanation need only be "reasonably specific." *People v. Harris*, 164 Ill. 2d 322, 332 (1994). The reasons articulated by the State were that Juror No. 60 was "nonresponsive" to questions and that his body language suggested that he did not want to be on the jury. We note that a potential juror's nonresponsiveness has been expressly accepted as a race-neutral reason for

exercising a peremptory strike (*People v. Harris*, 129 Ill. App. 3d 123, 175-76 (1989); *State v. Owen*, 129 Idaho 920, 933 (1997)) as has body language (*United States v. Forbes*, 816 F.2d 1006, 1010-11 (5th Cir. 1987) (finding "posture and demeanor" an adequate explanation)). Thus, the State's articulation of its reasons for excusing Juror No. 60 was adequate to satisfy its burden in the second stage.

¶ 36    Defendant further points out that the bases the trial court articulated in support of this ruling are not substantiated by the record. It is not problematic, in itself, that the trial court relied on observations of things that do not appear in the record, for, as noted above, resolving a *Batson* objection often turns on an evaluation of the credibility and demeanor of the attorney exercising the strike as well as of the potential juror against whom it is exercised. *Davis*, 231 Ill. 2d at 363. Thus, the trial court could properly rely on considerations such as Juror No. 60's apparent reluctance to respond to questions and that he was "looking down." *Davis*, 231 Ill. 2d at 364; see *People v. Munson*, 171 Ill. 2d 158, 178 (1996) (holding that potential juror's hesitation when asked whether he could sign a guilty verdict provided race-neutral reason for exercising peremptory strike); *People v. Mack*, 128 Ill. 2d 231, 239-40, 244 (1989) (upholding trial court's rejection of the defendant's *Batson* objections to the exclusion of potential jurors based on their failure to make eye contact with prosecutors and the "casual manner" in which one juror answered questions); *People v. Starks*, 287 Ill. App. 3d 1035, 1038 (1997) (upholding strikes based on one potential juror's lack of eye contact and fact that one "was quiet and did not appear to be a strong juror."). Moreover, we note that the trial court expressly stated the factual bases for its ruling on the record and defense counsel never gainsaid them during *voir dire*.

¶ 37    Defendant contends that nothing in the record indicates that Juror No. 60 was reluctant to answer any of the questions posed to him. Considerations like a juror's reluctance or degree of eye

contact are simply not the sorts of things that typically appear in a record and are the reason we owe the trial court deference on this issue (*Baisten*, 203 Ill. App. 3d at 80). The trial court accepted the State's explanation, additionally noting that Juror No. 60 was "looking down" and "not paying attention." Defendant complains that, instead of focusing on the reasons proffered by the State, the trial court interjected its own justifications for the use of the peremptory. However, while the trial court's comments concerning Juror No. 60's apparent reluctance were more detailed than the State's articulation, the court's observations were consistent with the State's justification of its actions. Defendant cites nothing that would suggest that the trial court's ruling was required to mirror the State's articulated explanation and we are aware of no such limitations on a trial court's ability to articulate its own observations.

¶ 38    Defendant argues that a number of the bases articulated by the State and some of the trial court's findings, are not only not supported by the record, but are actually contradicted by it. For example, defendant points out that the trial court stated that Juror No. 60 "needed prompting even to be heard." Defendant notes that there is no indication in the record that the court prompted this potential juror at any point. While we agree with defendant's characterization of the written record's limits on this point, the absence of a verbal direction to speak more loudly or clearly does not preclude the possibility of a nonverbal cue, such as a hand gesture, nor does such an absence from the record necessarily contradict the State's representations that the prospective juror was delayed in stating his responses to questions. And, unlike this court, the trial court, to which we owe deference (*Baisten*, 203 Ill. App. 3d at 80), viewed what took place at trial first hand.

¶ 39    Defendant points to several jurors who were not African American who provided similar answers to some of the questions asked of Juror No. 60 who the State did not use peremptory challenges to remove. Initially, we note that this argument assumes that differences in other,

legitimate factors did not exist, like observable demeanor or behavior during *voir dire*, to explain the disparate treatment. Furthermore, we note that defendant cites an unpublished order (*People v. Martin*, 2022 IL App (1st) 123561-U) for persuasive authority that "comparative juror analysis, a process which 'has taken center stage' when reviewing the propriety of a trial court's Step Three Batson determination, indicates purposeful discrimination because it demonstrates disparate treatment between similarly situated potential jurors." However, our supreme court has held:

> "The State's purposeful discrimination is not automatically established by the mere coincidence that an excluded juror shared a characteristic with a juror who was not challenged. The excluded juror may possess an additional trait that caused the State to find him unacceptable, while the juror who was not challenged may possess an additional characteristic that prompted the State to find him acceptable to serve as a juror." *People v. Wiley*, 165 Ill. 2d 259, 282-83 (1995).

We, of course, are compelled to follow the supreme court. *People v. Ellis*, 2020 IL App (1st) 190774, ¶26. We also note that, despite defendant's failure to provide an adequate record of the entirety of the venire or complete *voir dire* of other potential jurors, it is not disputed that the allegedly only other African American venireperson was in fact selected and served on the jury here. While not dispositive on this issue, "the unchallenged presence" of that juror is nonetheless a proper factor to consider, which "tends to weaken the basis for a *prima facie* case of discrimination." *People v. Rivera*, 221 Ill. 2d 481, 513 (2006); but see *In re A.S.*, 2016 IL App (1st) 161259, ¶¶ 31, 32 (holding that *prima facie* case was established where there was "clearly a pattern" of strikes on black members of the venire and State accepted the jury's only black person "under the shadow of a [previous] *Batson* challenge").

¶ 40    Defendant also complains that the trial court deviated from the prescribed procedure for addressing a *Batson* objection. Specifically, defendant observes that the second stage of the inquiry involves the State articulating a legitimate basis for its decision to use a peremptory challenge, after which a defendant is given an opportunity to show that the reason given by the State is pretextual. *Shaw*, 2014 IL App (4th) 121157, ¶ 19. Defendant points out that after it was given its opportunity, the State was allowed to again explain the basis of the strike. But, defendant did not interpose an objection when the trial court offered the State this second opportunity to address the issue, thus forfeiting the issue. *People v. Owens*, 394 Ill. App. 3d 147, 152 (2009). Further, defendant does not now explain why this purported error was plain. See *id*. Accordingly, we deem this issue forfeited. Moreover, defense counsel avers that she could find no case sanctioning the procedure employed by the trial court; we note that counsel has not called our attention to a case condemning it either.

¶ 41    Finally, we find defendant's reliance on *People v. Bradshaw*, 2020 IL App (3d) 180027, misplaced. In that case, the defendant appealed the trial court's determination that the State had not engaged in purposeful discrimination when it struck both of the only two potential jurors who were African American. *Id*. ¶ 10-12. The State offered two reasons for its decision: "a bad vibe" from the potential juror's demeanor and his "criminal contacts." *Id.* ¶ 14, 39. The trial court found the former insufficient but accepted the latter (the reviewing court, for reasons not pertinent here, found the trial court erred in accepting the latter explanation). *Id.* ¶¶ 39-40. We note that as the trial court found the State's assertion regarding the defendant's demeanor unfounded, a decision to which the reviewing court owed deference (*id.* ¶ 37), *Bradshaw* presented a very different situation to the one before us here. In this case, the trial court found the State's assessment of Juror No. 60's demeanor a legitimate explanation for its use of the peremptory strike. Thus, to find the

potential juror's demeanor an inadequate explanation in this case would require us to find that the trial court's determination was clearly erroneous. Conversely, in *Bradshaw*, the finding that the defendant's demeanor did not justify the State's strike was made by the trial court and the reviewing court owed it deference. In other words, to find the State's proffered justification insufficient here, we would have to abandon the deference we owe to the trial court on such questions while the *Bradshaw* court could simply give effect to that deference. As such, *Bradshaw* provides little support for defendant's argument.

¶ 42 Accordingly, defendant has not established that the trial court erred in finding that the State did not engage in purposeful discrimination when it excused Juror No. 60.

¶ 43                 B. Other Criminal Activity

¶ 44 We next turn to defendant's argument that the trial court erred in overruling his objection to a police officer's testimony that there had been reports of vehicular thefts in the vicinity of the incident at issue here. Detective Streit, when asked why he was in the area, testified that the police had received "a couple" reports of vehicular thefts in the area "over the last week or month." Defendant immediately objected. The trial court overruled defendant's objection, stating that Streit's testimony was "an explanation of why he's there." The trial court continued, "At this point, there should be no further inquiry made as to other questions about that." Defendant asserts that this testimony exceeded the proper bounds of the course-of-investigation exception to the hearsay rule. See *People v. Harris*, 2022 IL App (1st) 192509, ¶ 61. We review rulings of the trial court on evidentiary matters using the abuse-of-discretion standard. *People v. Ward*, 101 Ill. 2d 443, 455-56 (1984).

¶ 45 Generally, "a police officer may recount the steps taken in the investigation of a crime, and may describe the events leading up to the defendant's arrest, where such testimony is necessary

and important to fully explain the State's case to the trier of fact." *People v. Simms*, 143 Ill. 2d 174 (1991). Moreover, "We have also held that a police officer may testify about his conversations with others, such as victims or witnesses, when such testimony is not offered to prove the truth of the matter asserted by the other, but is used to show the investigative steps taken by the officer." *Id.* Notably, "[t]estimony describing the progress of the investigation is admissible even if it suggests that a nontestifying witness implicated the defendant." *Id.* However, such statements "should be admitted only to the extent necessary to provide that explanation and should not be admitted if they reveal unnecessary and prejudicial information." *People v. O'Toole*, 226 Ill. App. 3d 974, 988 (1992).

¶ 46 Defendant contends that Streit's statements about other vehicular thefts occurring in the area was both lacking in relevance and prejudicial. As for relevance, they certainly did explain why Streit was where he was at the time of the incident at issue in this case. It has been noted that " 'In criminal cases, an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct." *People v. Cameron*, 189 Ill. App. 3d 998, 1004 (1989) (quoting McCormick, *On Evidence*, § 249, at 734 (3d ed. 1984)). Hence, this testimony was relevant for a recognized purpose. However, the question remains as to whether Streit's specific reference to other crimes went too far. *Id.* (" '[An officer's] testimony that he acted upon information received, or words to that effect, should be sufficient. Nevertheless, cases abound in which the officer is allowed to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that he was entitled to give the information upon which he acted. The need for the evidence is slight, the likelihood of misuse great.' ").

¶ 47    In this case, Streit could have simply explained his presence by stating he was in the area on police business or investigating an unrelated matter. Thus, though relevant, Streit's testimony went beyond what was "necessary to provide [an] explanation" of his presence near the scene. *O'Toole*, 226 Ill. App. 3d at 988. Therefore, particularly given the apparent similarity between vehicle thefts and the crime with which defendant was charged, the trial court should have sustained defendant's objection to this testimony.

¶ 48    Nevertheless, we perceive no basis for disturbing defendant's conviction here, as the error was harmless. Sound guidance for the resolution of this issue can be found in *People v. Warlick*, 302 Ill. App. 3d 595 (1998). There, the defendant was charged with burglary, and a police officer testified that he was dispatched to the location where the defendant was apprehended regarding a "burglary in progress." *Id.* at 597. We emphasize that in *Warlick*, the testimony at issue involved a report of a burglary occurring at the time and location where the defendant was charged with committing a burglary. The *Warlick* court held that the admission of this testimony was harmless because its admission could not "have significantly influenced the outcome of the trial." *Id.* at 601. With stronger reason, Streit's testimony concerning vehicular thefts occurring at some earlier time was also harmless.

¶ 49    We also emphasize here that the evidence against defendant was substantial. Defendant was apprehended fleeing from the crime scene. Aviles positively identified defendant as the perpetrator. Of course, "the testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Defendant contends that Streit's testimony drew "a connection—even if just subconsciously—between [defendant] and the recent string of vehicular thefts." However, defendant cites no case holding such a tenuous connection unfairly prejudiced a defendant. We see

no real possibility that the result of the trial would have been different had Streit not mentioned that there were reports of vehicular thefts occurring in the area "over the last week or month."

¶ 50    Defendant complains that the trial court did not give a limiting instruction as to how this testimony could be properly used by the jury. This is true; however, it is also true that defendant did not request that such an instruction be given. This omission forfeits the issue. *People v. Gonzalez*, 379 Ill. App. 3d 941, 956 (2008); *People v. Smith*, 362 Ill. App. 3d 1062, 1082 (2005).

¶ 51    In sum, while the trial court should have sustained defendant's objection to Streit's testimony concerning other thefts in the vicinity, its error was harmless.

¶ 52                                      C. Right to Counsel

¶ 53    Defendant also contends that the trial court denied his right to be represented by counsel during his sentencing hearing. Following the conclusion of the trial and after extensive questioning and admonishments by the trial court, defendant waived his right to counsel. The validity of that waiver is not in question here. In the course of addressing the waiver with defendant, the trial court told defendant that the waiver would apply to other cases that were pending and that he would "not be given the opportunity to change his mind during a jury trial." Defendant indicated that he understood these provisions. Subsequently, defendant filed a number of posttrial motions. After these motions were resolved, the case proceeded to the sentencing hearing.

¶ 54    At the beginning of the sentencing hearing, the trial court first inquired whether defendant was "under any mental or physical disability, on any medication or under the influence of drugs or alcohol that [was] affecting [his] ability to understand the proceeding." Defendant stated that he was not. The following colloquy ensued:

> "THE COURT: Are you prescribed any medications that you did not take today, and
> perhaps that is affecting your ability to understand this proceeding?"

DEFENDANT: No, but I would like some representation before we proceed with the sentencing hearing.

THE COURT: You have fired the Public Defender's Office.

DEFENDANT: I would like to hire another one.

THE COURT: Hire a Public Defender?

DEFENDANT: Yes. I have no experience.

THE COURT: You don't have the ability to hire a Public Defender.

DEFENDANT: You do. You have the power, and I just need you to grant it.

THE COURT: You have been found to be a self-represented litigant. That was at your own choice after a very lengthy admonition hearing that we had, and—

DEFENDANT: It's just obvious I have no experience whatsoever. I just merely needed to address some matters that I know my attorney—former Attorney Dietrich would not address at my request.

THE COURT: So this is the reason why now you would like a new attorney.

DEFENDANT: Exactly.

THE COURT: Because you were successful in, as you say, firing Attorney Dietrich.

DEFENDANT: Yes, I fired her.

THE COURT: That motion is denied."

The sentencing hearing then proceeded, and defendant was sentenced to five years' imprisonment.

¶ 55    Defendant now contends that his request for counsel at the beginning of the sentencing hearing vitiated his earlier waiver and, therefore, the trial court violated his right to counsel. Defendant relies on *People v. Martin*, 2021 IL App (4th) 180267, ¶ 33, where the court discussed the "continuing waiver rule." Pursuant to that rule, a defendant's waiver of the right to counsel

"stays in place through the remaining stages." *Id.*; see also *People v. Baker*, 92 Ill. 2d 85, 91-92 (1982). Two exceptions exist: "(1) the defendant later requests counsel or (2) other circumstances suggest that the waiver is limited to a particular stage of the proceedings." *Martin*, 2021 IL App (4th) 180267, ¶ 33.

¶ 56    However, the right to revoke a waiver of counsel is not absolute. *People v. Pratt*, 391 Ill. App. 3d 45, 56 (2009). The diligence of a defendant in seeking to revoke the waiver is a relevant consideration, as is the right of all parties to a speedy trial. *People v. Friedman*, 79 Ill. 2d 341, 347 (1980). The timing of the request is pertinent as well. See *People v. Trump*, 38 Ill. App. 3d 44, 46 (affirming denial of the defendant's request to have counsel appointed where it was made after trial had commenced); *cf. People v. Burton*, 184 Ill. 2d 1, 24 (1998) ("Once such proceedings have begun, the trial judge has discretion to deny a defendant's request to represent himself."). Indeed, requests to revoke a waiver of the right to counsel made shortly before trial or while trial is ongoing are routinely denied. *People v. Gibson*, 2017 IL App (1st) 143566, ¶ 26; *Pratt*, 391 Ill. App. 3d at 55-56; *People v. Ogurek*, 356 Ill. App. 3d 429, 436-37 (2005); *cf. People v. Leeper*, 317 Ill. App. 3d 475, 481 (2000) (denying request to waive right to counsel and proceed *pro se* where request was not made "until after meaningful proceedings had begun"). Further, "[i]f a defendant wishes to revoke that waiver later on, it is within the trial court's discretion whether to appoint new counsel." *Gibson*, 2017 IL App (1st) 143566, ¶ 25.

¶ 57    Defendant asserts that his unequivocal request for representation triggered the first exception. Defendant's request would, indeed, appear to fall within its scope. A trial court's decision regarding whether a defendant revoked an earlier waiver of the right to counsel is reviewed using the abuse of discretion standard. *People v. Griffin*, 305 Ill. App. 3d 326, 329 (1999).

Therefore, we will reverse only if no reasonable person could agree with the trial court. *People v. Farris*, 2012 IL App (3d) 100199, ¶ 26.

¶ 58 Defendant calls our attention to *People v. Palmer*, 382 Ill. App. 3d 1151, 1163 (2008). In that case, the defendant represented himself at trial and during the sentencing hearing. Subsequently, he filed a motion to reconsider his sentence and requested to be represented by counsel. The trial court denied the defendant's request, explaining:

" '(1) [The defendant] waived his constitutional right to assistance of counsel for proceedings in the [c]ircuit [c]ourt; (2) although [the] defendant has the right to appointed counsel on appeal, he does not have the absolute right to revoke his waiver at this stage of the proceedings in the [c]ircuit [c]ourt; and (3) [the] defendant has not shown good cause for the [c]ircuit [c]ourt to exercise its discretion to allow withdrawal of [the] defendant's waiver of counsel.' " *Id.* at 1155.

¶ 59 The reviewing court—accepting the State's confession of error—reversed. It explained that defendants who have been admonished that they will not be allowed to change their mind during trial may be held to an earlier decision to proceed *pro se*. *Id*. The *Palmer* court cited two reasons for this rule: "(1) the importance of judicial administration and (2) the need to avoid giving a defendant the opportunity 'to game the system' (as discussed earlier), a court would be justified in informing a defendant of a deadline (perhaps a few weeks before the trial date) by which his decision to proceed *pro se* at trial will become irrevocable, making clear that it is not just at trial itself that the decision will become irrevocable." *Id*. The reviewing court ultimately found the trial court erred in denying the defendant's request, noting that the defendant motion for counsel to be appointed occurred after sentencing and "at a new stage of the proceedings, which constituted a clean slate for the trial court's consideration of the issue." *Id*. We note that unlike *Palmer*, the

"slate" was not "clean" when defendant made his request. In *Palmer*, the defendant requested counsel in a motion after the sentencing hearing had concluded.

¶ 60    Here, defendant sought to revoke his waiver after the parties had convened and the sentencing hearing had commenced, albeit near the hearing's beginning. The trial court denied the request. In the course of the trial court's questioning of defendant about the requested revocation, defendant articulated that he sought the reappointment of counsel because of his lack of experience. That is a fair point. But, defendant waited until the sentencing hearing commenced, manifesting a lack of diligence that would have required the hearing be postponed, undermining the orderly and efficient administration of justice. See *People v. West*, 137 Ill. 2d 558, 588 (1990) ("Although the sixth amendment guarantees an accused the right to assistance of counsel in a trial for certain crimes, it does not include the right to select counsel of choice, particularly where the exercise of that claimed right would delay or impede the effective administration of justice."). Thus, the question becomes whether the untimeliness of defendant's request is such an insignificant consideration that no reasonable person could agree with the trial court's decision to deny defendant's request to have counsel reappointed.

¶ 61    Recently, the First District was confronted with a similar situation in *People v. Armstrong*, 2025 IL App (1st) 210723-U. In that case, during posttrial proceedings, the defendant waived his right to counsel because he wished to raise a *pro se* claim of ineffective assistance of counsel. *Id.* ¶ 30. The defendant represented himself through various proceedings, and then the sentencing hearing commenced. When it came time to offer evidence and make arguments in mitigation, the defendant indicated he was not prepared to do so. The trial court granted him a six-day continuance. When proceedings resumed, the defendant asked if it was "too late to get an attorney," and the trial court replied that it was.

¶ 62    On appeal, the defendant argued that the trial court abused its discretion in denying his request to revoke his wavier of his right to counsel. *Id.* ¶ 71. The reviewing court acknowledged that a waiver of counsel is generally effective until "a later request for counsel is made." *Id.* However, it further observed that a "criminal defendant's right to revoke a waiver of counsel is not absolute." *Id.* ¶ 74 (citing *Pratt*, 391 Ill. App. 3d at 52-53). Affirming the trial court's ruling, the reviewing court noted that granting the defendant's request "would have meant either beginning the proceeding anew or continuing it yet again for a lawyer to be appointed who would then need to become familiar with the evidence presented and the arguments made thus far." *Id.* ¶ 78. Similarly, in this case, granting defendant's request would have required a continuance for the newly appointed attorney to familiarize herself or himself with the case (we find it of no moment that some witnesses had already testified during the sentencing hearing in *Armstrong*, as a new attorney would have had to take time to become acquainted with the evidence regardless of whether it had been presented). The *Armstrong* court noted, and we agree, that granting the defendant's belated request would have "create[d] unwarranted delay," which is also the case here.

¶ 63    Thus, a reasonable person could agree with that position as well. We cannot, therefore, conclude that the trial court abused its discretion in this case.

¶ 64                                    IV. CONCLUSION

¶ 65    In light of the foregoing, the judgment of the circuit court of De Kalb County is affirmed.

¶ 66    Affirmed.